FILED
2026 Oct-22 AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| JOSHUA RUSSELL SANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-00336-LCB-NAD |
| | ) | |
| SERGEANT JACOBS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

# REPORT AND RECOMMENDATION

Plaintiff Joshua Russell Sanders filed an amended *pro se* complaint pursuant to 42 U.S.C. § 1983, which he later amended further, alleging violations of his civil rights. Doc. 15; *see* Doc. 36. In his amended complaint, Plaintiff Sanders names the following Defendants who remain in the case: Sergeant River Jacobs, Officer Christopher Stewart, Travis Schult, Demetrius Charley, Chevelle Hunte, Glenn Barr, Jeremy Pelzer, and Bryan McPhail.[1]

Sanders alleges violations of his constitutional rights related to events on October 15, 2023, at Limestone Correctional Facility. *See, e.g.*, Doc. 15 at 5, 13; Doc. 36 at 2. Sanders seeks money damages, as well as declaratory and injunctive

[1] All Defendants and all claims were dismissed by court order on April 14, 2026, except for the following: (1) Sanders' excessive force claim again Jacobs, Stewart, Schult, Charley, Hunte, and Barr; (2) Sanders' failure to intervene claim against Pelzer; and (3) Sanders' procedural due process claim against McPhail. *See* Doc. 73.

relief. Doc. 15 at 19–20; Doc. 36 at 4.

Consistent with the usual practices of this court, the amended complaint was referred for a preliminary report and recommendation. *See* 28 U.S.C. § 636(b)(1); *McCarthy v. Bronson*, 500 U.S. 136 (1991); N.D. Ala. Local Rule 72.1. For the reasons stated below, this report recommends that the court grant in part and deny in part Defendants' motion for summary judgment (Doc. 74). Specifically, this report recommends that the court dismiss without prejudice the claim against Defendant Stewart, that the court grant summary judgment on the claim against Defendant McPhail, and that the other claims proceed—i.e., the excessive force claim against Jacobs, Schult, Charley, Hunte, and Barr, in their individual capacities; and the failure to intervene claim against Pelzer, in his individual capacity.

## BACKGROUND

### A. Procedural background

On March 15, 2024, Sanders initiated this action by filing a complaint, alleging violations of his civil rights pursuant to § 1983, and naming the Alabama Department of Corrections (ADOC) as the only Defendant. Doc. 1. On July 10, 2024, Sanders was ordered to file an amended complaint. Doc. 14.

On August 5, 2024, Sanders filed an amended complaint against Defendants Jacobs, Stewart, Crabtree, Apel, McPhail, Schult, Charley, Hunte, and Barr, alleging violations of his rights under the Eighth and Fourteenth Amendments. Doc. 15.

Those Defendants were ordered to file a special report, responding to Sanders' allegations and claims. Doc. 16.

Then, on January 6, 2025, Sanders again moved to amend his complaint to add Commissioner John Q. Hamm, Warden William Streeter, Lieutenant Jeremy L. Pelzer, and Officer K. Tate as Defendants. Doc. 36. The motion was granted, and construed as an amendment to Sanders' prior amended complaint. Doc. 37. In light of Sanders' additional amendment, the order for special report (Doc. 16) was withdrawn. Doc. 37.

On October 22, 2025, a report and recommendation was entered, recommending dismissal of all of Sanders' claims except for (1) his Eighth Amendment excessive force claim for damages against Defendants Jacobs, Stewart, Schult, Charley, Hunte, and Barr, in their individual capacities, (2) his Eighth Amendment failure to intervene claim for damages against Pelzer, in his individual capacity, and (3) his Fourteenth Amendment procedural due process claim against McPhail for damages in his individual capacity, and for declaratory and injunctive relief in his individual and official capacities. Doc. 50. On April 14, 2026, the court overruled Sanders' objections and adopted that report and recommendation. Doc. 73.

On April 30, 2026, in response to a revised order for special report (Doc. 57), Defendants filed a special report, supported by affidavits and other evidence. Doc.

74. On May 18, 2026, the parties were notified that the court would construe the special report as a summary judgment motion, and Sanders was notified that he had 21 days to respond to the summary judgment motion by filing affidavits or other materials. Doc. 75. Sanders also was advised of the consequences of any default or failure to comply with Federal Rule of Civil Procedure 56. Doc. 75; *see Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).

On June 15, 2026, Sanders filed evidence consisting of inmate complaint forms. Doc. 76. And on June 29, 2026, Sanders filed his response, in which he contested the veracity of affidavits submitted by Defendants. Doc. 77.

## B. Factual background

### 1. Sanders' sworn amended complaint

Sanders' sworn amended complaint (as further amended, Doc. 36), alleges the following: On October 15, 2023, while incarcerated at Limestone, Sanders was awakened by a disturbance in his dormitory. Doc. 15 at 4–5, 13. Sanders walked out of his cell to see what caused the disturbance, smelled mace, and saw several officers escorting a handcuffed inmate out of the dorm. Doc. 15 at 14. Sanders returned to his cell. Doc. 15 at 14.

Sanders was awakened a second time by correctional officers standing at the entrance to his cell. Doc. 15 at 14. Barr and Hunte instructed Sanders to step out of his cell so that they could search him. Doc. 15 at 14. When Sanders complied, Barr

and Hunte performed a search of Sanders, told him to put on his shoes, and then handcuffed him. Doc. 15 at 14. Sanders was told to wait with Pelzer near the dorm exit while officers performed a cell-by-cell search of the dorm. Doc. 15 at 14. Sanders then was taken to the shift office and placed in a waiting area with four other inmates "previously detained from the initial incident in J dorm." Doc. 15 at 14; Doc. 36 at 2.

Sanders was removed from the holding area for questioning and learned from Charley that he would receive a body chart. Doc. 15 at 15. But when Sanders left the shift office to go to the infirmary, he was "stopped on the porch of the shift office . . . by a barricade of correctional officers." Doc. 15 at 15. Barr, Charley, Hunte, Schult, Stewart, and Jacobs were present. Doc. 15 at 15. Those officers questioned Sanders about his participation in an assault on Stewart. Doc. 15 at 15. Although Sanders denied any involvement in the assault, Jacobs "responded by punching the Plaintiff in the face." Doc. 15 at 15. The other officers also punched Sanders in the face, head, and body until Sanders fell to the ground, where he was "maced, stomped, and clubbed with batons by all six officers." Doc. 15 at 15. During this time, Sanders remained handcuffed with his hands behind his back, so he could not "shield himself." Doc. 15 at 15. Pelzer saw this incident but did not stop the other officers. Doc. 36 at 3.

Sanders sustained a broken finger, a black eye, welts and bruising to his torso

and legs, and an open wound on his left shin. Doc. 15 at 5, 15. Sanders was taken to the infirmary and decontaminated, but was denied adequate medical treatment when the "officer on duty in the infirmary" prohibited the nurse from providing Sanders with stitches. Doc. 15 at 16. Sanders had a body chart, but no photographs were taken of his injuries. Doc. 15 at 16. Sanders was held in the Mental Health Observation Unit, where on October 17, 2023, non-party Sergeant Morrison documented Sanders' injuries with her phone. Doc. 15 at 16.

At a subsequent disciplinary hearing, the hearing officer—McPhail—found Sanders guilty of assaulting an officer and inciting a riot. Doc. 15 at 16. Sanders was not allowed to see the video footage of the incident, nor was he allowed to present witnesses or submit written questions. Doc. 15 at 16.

**2. Documentary evidence submitted by Defendants**

An incident report dated October 15, 2023, appears to include various, substantially similar summaries, including the following: Stewart was assigned to "Inmate Movement Control B-Side" and, at approximately 2:15 a.m. during "institutional count," Stewart observed a cell phone charging in Housing Unit J and tried to secure the phone. Doc. 74-1 at 2. Several "unknown inmates" surrounded Stewart and attacked him, and Stewart observed inmate Travel Gaspard pull out an inmate-made knife with which he attacked Stewart. Doc. 74-1 at 2. Stewart "administered a burst of Sabre," and delivered defensive strikes to inmates. Doc.

74-1 at 2. An Officer Douglas called a "code blue," to which multiple officers responded. Doc. 74-1 at 2. Inmate Gaspard was restrained and escorted to the infirmary, and Plaintiff Sanders was identified through video as participating in the assault on Stewart. Doc. 74-1 at 2.

Inmate Gaspard ended up with the phone. Doc. 74-1 at 2. Stewart grabbed Gaspard, who "took an aggressive stance with clenched fists." Doc. 74-1 at 2. Stewart sprayed Gaspard in the face with Sabre Red, but Gaspard punched Stewart, and Stewart punched him back. Doc. 74-1 at 2. Barr sprayed Gaspard in the face again. Doc. 74-1 at 2. Multiple inmates then attacked Stewart. Doc. 74-1 at 2.

Another officer called a "code blue" over the radio and multiple officers responded. Doc. 74-1 at 2. When Stewart placed Gaspard on the ground, Gaspard removed a prison-made knife from his waistband. Doc. 74-1 at 2. Stewart struck the knife out of Gaspard's hand and recovered it. Doc. 74-1 at 2. Stewart was later transferred to a hospital for stitches. Doc. 74-1 at 1–2.

In addition, a body chart completed on October 15, 2023, at 5:50 a.m. indicates that Sanders reported he was "handcuffed by the wrist and assaulted." Doc. 74-10 at 1. Sanders was noted to have lacerations around his eyes, and abrasions on his hands. Doc. 74-10 at 1. Sanders' cuts were cleaned and bandaged, and he then was placed in restrictive housing. Doc. 74-10 at 1–2. Sanders reported that he had been assaulted and threatened. Doc. 74-10 at 2.

Disciplinary reports arising from the October 15, 2023 incident show that Sanders was charged with assaulting a person associated with ADOC and inciting a riot or rioting. Doc. 74-11 at 1, 11. Sanders requested Hunte, Pelzer, and two inmates to be called as witnesses. Doc. 74-11 at 3. Pelzer declined to testify and the inmates did not respond to attempts to find them. Doc. 74-11 at 2.

At the disciplinary hearing, Stewart testified as follows: When he answered Schult's call for assistance, five inmates approached them and blocked the exit. Doc. 74-11 at 4. Schult gave commands for the inmates to back up and disperse, and an unknown inmate grabbed the cell phone from Schult's hand. Doc. 74-11 at 4. When Schult grabbed that inmate, the inmate threw the phone to inmate Gaspard. Doc. 74-11 at 4. Gaspard started to leave, but Stewart grabbed Gaspard's shoulder and instructed him to stop. Doc. 74-11 at 4. Gaspard turned around with clenched fists, so Stewart pushed him back and sprayed Gaspard in the face with Sabre Red. Doc. 74-11 at 4. Gaspard then punched Stewart, so Stewart "delivered multiple defensive strikes to the facial area" of Gaspard. Doc. 74-11 at 4. Barr also sprayed Gaspard in the face with Sabre Red. Doc. 74-11 at 4. Other inmates began assaulting Stewart. Doc. 74-11 at 4. Stewart took Gaspard "to the ground," and Gaspard "brandished an inmate made knife." Doc. 74-11 at 4. Stewart knocked the knife out of Gaspard's hand and recovered it, then secured Gaspard and called a "code blue." Doc. 74-11 at 4. Stewart asserted that Sanders tried to incite other inmates to start a riot. Doc.

74-11 at 11.

Hunte testified that when he went to retrieve Sanders from his bunk, Sanders appeared to be asleep. Doc. 74-11 at 4.

McPhail found Sanders to be guilty as charged, and sentenced Sanders to loss of canteen, telephone, and visitation privileges for 60 days, as well as disciplinary segregation for 45 days. Doc. 74-11 at 4–5. McPhail also recommended Sanders for custody review.[2] Doc. 74-11 at 8.

Forms from the hearing indicate that all procedural requirements were met, including allowing Sanders to call witnesses and prepare questions for witnesses. Doc. 74-11 at 5, 16.

### 3. Defendants' sworn factual responses

#### a. Officer Schult

In a sworn affidavit, Schult avers as follows: At approximately 2:00 a.m. on October 15, 2023, he and Barr began the institutional count. Doc. 74-5 at 1. Schult saw a cell phone charging inside of cell 1 in J Dorm. Doc. 74-5 at 1. Schult confiscated the phone and charger, and asked the inmates their names, which the inmates refused to provide. Doc. 74-5 at 1. Schult called Stewart to assist him in identifying the inmates who were in the relevant cell. Doc. 74-5 at 1. Stewart did

[2] Sanders neither alleges nor presents evidence that his custody level was changed based on this incident or the resulting disciplinary findings.

not know the inmates' names, but Stewart and Schult were surrounded by unknown inmates. Doc. 74-5 at 1. When Schult gave commands for the inmates to disperse, an unknown inmate grabbed the phone and tossed it to other inmates, then an inmate ran off with the phone. Doc. 74-5 at 1. Schult chased that inmate, but the phone was lost in "the crowd of inmates and blanket tents." Doc. 74-5 at 1.

A "code blue" was called and additional help arrived, leading to the involved inmates being handcuffed and escorted to the shift office. Doc. 74-5 at 1. Inmates were taken to the health care unit for body charts. Doc. 74-5 at 1–2. At no time did Schult "punch, stomp, spray, strike with a baton, or use force of any kind" on Sanders. Doc. 74-5 at 1.

**b. Officer Barr**

In a sworn affidavit, Barr avers that he was instructed to retrieve Sanders from his cell in J Dorm because Barr saw Sanders with the missing cell phone Schult had tried to confiscate. Doc. 74-6 at 1. Barr avers that at "no time did [he] use excessive force against inmate Sanders," and that he "did not assault him, punch him or stomp on him while he was on the ground," nor has he ever used a baton against Sanders. Doc. 74-6 at 2. Barr avers that he used a burst of Sabre Red on another inmate when inmates were assaulting Stewart. Doc. 74-6 at 2.

**c. Officer Hunte**

Similarly, in a sworn affidavit, Hunte avers that his only role was to enter J

Dorm to detain Sanders because of Sanders' involvement with an assault on an officer. Doc. 74-8. Sanders was removed from the dorm in restraints and taken to the infirmary for a body chart. Doc. 74-8. Hunte denies having a physical altercation with Sanders. Doc. 74-8.

**d. Officer Charley**

Charley, by sworn affidavit, avers that he had no part in the incident in question as he was not in or around J Dorm at the time, and at no time did he have a physical altercation with Sanders.[3] Doc. 74-7.

**e. Officer Jacobs**

By sworn affidavit, Jacobs avers that on October 15, 2023, at 3:00 a.m., he was instructed to retrieve Sanders and two other inmates from J Dorm. Doc. 74-4. All three inmates were taken to the infirmary for body charts and medical evaluations, but "[n]o unjustified force was applied at any time during this transport." Doc. 74-4.

**f. Officer Pelzer**

By sworn affidavit, Pelzer avers that he has no memory of Sanders, but that he reviewed the incident report and was able to vaguely recall the incident in question. Doc. 74-2 at 1. In large part, Pelzer's affidavit simply recounts the

[3] The incident report notes that Charley interacted with J Dorm inmate Robinson at 2:20 a.m. *See* Doc. 74-1.

incident report. Doc. 74-2 at 1–2; *see* Doc. 74-1. Pelzer avers that "it appears [Pelzer] identified inmate Sanders as one of the inmates who assaulted Officer Stewart," and that "[a]ny injuries inmate Sanders sustained were during the incident where he decided to physically assault staff and those staff members responded with force as indicated by the incident report." Doc. 74-2 at 2.

**g. Hearing Officer McPhail**

McPhail submitted a sworn affidavit averring the following: McPhail served as the hearing officer for the disciplinary charges brought against Sanders, and Sanders was not denied due process at his October 24, 2023 hearing on charges of assaulting an ADOC officer and inciting a riot or rioting. Doc. 74-3 at 1–3. McPhail avers that Sanders was not found guilty based on the video surveillance of the incident, and that the video footage was used only by Pelzer to identify the inmates involved. Doc. 74-3 at 2. The video footage was not submitted as evidence or considered in any way during the disciplinary hearing. Doc. 74-3 at 2.

McPhail also avers that he did not deny Sanders' request for witnesses during the hearing. Doc. 74-3 at 2. Sanders requested that Hunte, Pelzer, and inmates Leonard and Riley be called as witnesses. Doc. 74-3 at 2. Hunte was present during the hearing and was asked "all question(s) that were deemed relevant in this hearing," but Sanders declined to ask him any oral questions. Doc. 74-3 at 2. Pelzer declined to participate in the hearing. Doc. 74-3 at 2. And, while an officer looked

for inmates Leonard and Riley to have them attend Sanders' hearing, his attempt to locate these inmates was unsuccessful. Doc. 74-3 at 2–3. Sanders declined to submit written questions to Stewart, and McPhail limited Sanders' questions for Hunte to what Hunte reasonably could be expected to know. Doc. 74-3 at 3.

**4. Sanders' responses**

Sanders filed sworn statements regarding Schult, Charley, Barr, Stewart, Hunte, and Jacobs detaining and assaulting him and four other inmates on October 15, 2023. Doc. 66; Doc. 67; Doc. 68; Doc. 69; Doc. 70; *see* Doc. 76. Sanders avers that the assaults on the porch of the shift office were in retaliation for the assault on Stewart, and that Sanders was not involved in the incident involving Stewart. Doc. 66 at 2; Doc. 67 at 2; Doc. 68 at 2; Doc. 69 at 2; Doc. 70 at 2.

In an unsworn response to Defendants' summary judgment motion, Sanders objects to the evidence submitted by Defendants, asserts that he had no involvement in the assault on the officers in question, and notes that at no time did Stewart identify Sanders as one of his attackers. Doc. 77 at 1, 5. Sanders also reiterates his allegation that he was ambushed by officers outside of the shift office. Doc. 77 at 1. Sanders asserts that, while Hunte, Jacobs, Schult, and Barr aver a physical altercation involving Sanders never occurred, his contemporaneous body chart showing his injuries demonstrates that an altercation did occur.[4] Doc. 77 at 2–3.

[4] Although Sanders also disputes a purported affidavit from Stewart (Doc. 77 at 2–

Sanders also filed additional sworn complaints with ADOC, alleging that Defendants assaulted him. Doc. 76. Sanders further asserts that he should have been provided with the surveillance footage allegedly used to identify him. Doc. 77 at 1–2. Sanders disputes McPhail's claim that his requested witnesses were ever summoned to appear at his hearing. Doc. 77 at 2.

## LEGAL STANDARD

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute about a material fact is "genuine," if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To avoid summary judgment, the nonmovant must go beyond the allegations to offer specific facts that create a genuine dispute for trial. *Celotex*, 477 U.S. at 324–25. The court's job is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The court must construe all evidence and draw all reasonable inferences

---

3), Stewart did not file an affidavit as, despite numerous attempts by the court, Stewart could not be located to serve him with notice of this action. *See* Doc. 16; Doc. 27; Doc. 39; Doc. 42; Doc. 48; Doc. 52.

in favor of the nonmovant. *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).

In addition, when ruling on a defendant's summary judgment motion, the court must consider any "specific facts" that a *pro se* plaintiff pleaded in his sworn complaint. *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). The court liberally construes a *pro se* pleading. *See, e.g.*, *Jones v. Florida Parole Comm'n*, 787 F.3d 1105, 1107 (11th Cir. 2015) (the court should hold a *pro se* pleading to "a less stringent standard than a pleading drafted by an attorney").

Furthermore, the practical reality that a plaintiff's "evidence consists mainly of his own testimony in his verified complaint, sworn response, and sworn affidavit does not preclude a finding that a genuine dispute of material fact exists." *Sears v. Roberts*, 922 F.3d 1199, 1208 (11th Cir. 2019). And, "[e]ven if his sworn statements turn out to be exaggerations or false, they are enough to raise a genuine issue of material fact" for trial. *Id.* at 1209. When ruling on a summary judgment motion, a court cannot make credibility determinations. *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006).

## DISCUSSION

Remaining in this case are the following claims: Sanders' claims for excessive force against Jacobs, Stewart, Schult, Charley, Hunte, and Barr, in their individual capacities; his claim for failure to intervene against Pelzer, in his individual capacity; and his claim for procedural due process violations against McPhail. *See* Doc. 73. For the reasons discussed below, the court should grant in part and deny in part Defendants' summary judgment motion. The court should dismiss Sanders' claim against Stewart for lack of service, should grant summary judgment on Sanders' due process claims against McPhail, and should deny summary judgment on the remaining Eighth Amendment excessive force claims against Jacobs, Schult, Charley, Hunte, and Barr and failure to intervene claim against Pelzer.

### I. The court should dismiss without prejudice Sanders' claim against Stewart for lack of service.

When a defendant cannot be served in a timely fashion, "the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant." Fed. R. Civ. P. 4(m). Here, the court has no means of locating Officer Stewart using "reasonable effort." *See Turner v. Warden, GDCP*, 650 F. App'x 695, 702–03 (11th Cir. 2016) (for prisoners proceeding *in forma pauperis*, the court must make a "reasonable effort" to locate defendants (citing *Richardson v. Johnson*, 598 F.3d 734, 739–40 (11th Cir. 2010)).

Requests to waive service of process were served on Officer Stewart on September 4, 2024 (Doc. 16), and December 5, 2024 (Doc. 27). ADOC then was ordered to provide Stewart's first name and last known address. Doc. 39. After ADOC complied (Doc. 40), a third attempt to have Stewart waive service was made on June 17, 2025 (Doc. 42). When that failed, service of process through the United States Marshals Service was ordered (Doc. 48), but the Marshals Service returned the summons unexecuted (Doc. 52).

Despite the court's best efforts, Stewart remains unserved. Accordingly, the court should dismiss Sanders' claim against Stewart without prejudice for lack of service. *See Turner*, 650 F. App'x at 702–03.

## II. The court should grant summary judgment on Sanders' Fourteenth Amendment procedural due process claim against McPhail.

Under the Due Process Clause of the Fourteenth Amendment, prisoners may not be deprived of life, liberty, or property without due process of law. U.S. Const. amend XIV; *see Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). "To bring a due process claim under section 1983, a plaintiff must establish (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Resnick v. KrunchCash, LLC*, 34 F.4th 1028, 1035 (11th Cir. 2022) (quotation marks omitted).

Here, Sanders has not shown the deprivation of any constitutionally protected liberty interest. In this regard, the "Supreme Court has identified two situations in

which a prisoner can be further deprived of his liberty such that due process is required": (1) "when a change in the prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court"; and (2) when a deprivation "'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Kirby v. Siegelman*, 195 F.3d 1285, 1290–91 (11th Cir. 1999) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)); *see Jacoby v. Baldwin Cty.*, 835 F.3d 1338, 1347 (11th Cir. 2016). Sanders has not alleged or identified evidence of any such deprivation.

The only record evidence—which is undisputed—is that Sanders received the following discipline after the hearing: loss of canteen, telephone, and visitation privileges for 60 days, as well as disciplinary segregation for 45 days. Doc. 74-11 at 4–5.

Well settled caselaw establishes that, without more, a 45-day assignment to restricted housing does not amount to a change in confinement so severe that it essentially exceeds an imposed sentence, and does not impose an atypical and significant hardship. *See, e.g.*, *Sandin*, 515 U.S. at 484–86 (concluding that a prisoner had no liberty interest protecting against a 30-day disciplinary assignment to segregated confinement because the confinement did not "present a dramatic departure from the basic conditions of [the inmate's] sentence"); *Rodgers v. Singletary*, 142 F.3d 1252, 1252–53 (11th Cir. 1998) (concluding that a prisoner's

placement in administrative confinement for two months did not deprive him of a constitutionally protected liberty interest); *Williams v. Pelzer*, No. 5:24-CV-00706-HNJ, 2025 WL 2176515, at *13–15 (N.D. Ala. July 31, 2025) (collecting cases demonstrating that segregation ranging from 60 to 90 days does not present atypical and significant hardships).

Likewise (as a matter of well settled caselaw), whether in combination with the 45-day reassignment to restricted housing or on their own, the 60-day restrictions on canteen, telephone, and visiting privileges cannot constitute actionable deprivations of a constitutionally protected liberty interest. *See, e.g.*, *Overton v. Bazzetta*, 539 U.S. 126, 131, 134 (2003) (upholding a two-year restriction on visitation privileges, and reasoning that prison confinement requires the surrender of liberties and privileges enjoyed by other citizens); *Fuller v. Gates*, 656 F. App'x 944, 946 (11th Cir. 2016) (the revocation of an inmate's telephone and visitation privileges for 45 days following a disciplinary infraction did not trigger due process protections); *Charriez v. Secretary, Fla. Dep't of Corr.*, 596 F. App'x 890, 894 (11th Cir. 2015) (the loss of visitation privileges for one year did not amount to a deprivation of a constitutionally protected liberty interest); *Butts v. Martin*, 877 F.3d 571, 590 (5th Cir. 2017) (the loss of commissary privileges for 30 days did not implicate a protected liberty interest). Consequently, even if there were genuine disputes of material fact as to whether the disciplinary process was constitutionally

inadequate, Sanders has not shown any deprivation of a constitutionally protected liberty interest to which Fourteenth Amendment procedural due process protection could have attached.

## III. The court should deny summary judgment on Sanders' Eighth Amendment excessive force claims against Jacobs, Schult, Charley, Hunte, and Barr.

Under the Eighth Amendment,[5] "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)) (quotation marks omitted). "What is necessary to establish an 'unnecessary and wanton infliction of pain' . . . varies according to the nature of the alleged constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley*, 475 U.S. at 320).

In the context of a custodial excessive force claim, "corrections officers must balance the need 'to maintain or restore discipline' through force against the risk of injury to inmates." *Hudson*, 503 U.S. at 6 (citations omitted). And, "officials confronted with a prison disturbance must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if

[5] *See, e.g.*, *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 764 & n.12 (2010); *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) (stating that, with a few exceptions, the United States Supreme Court "has held that the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States").

guards use force." *Id.*

For instance, the use of force generally is justified where it is "necessary to restore order." *See, e.g.*, *Williams v. Radford*, 64 F.4th 1185, 1197 (11th Cir. 2023) (citing *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990)); *accord Pearson v. Taylor*, 665 F. App'x 858, 864 (11th Cir. 2016) ("In general, prison officials are authorized to use force when a prisoner repeatedly fails to obey an order . . . Officers are not required to convince every prisoner that their orders are reasonable . . . before resorting to force." (citations omitted)).

Regardless, on a custodial excessive force claim, "whenever prison officials stand accused of using excessive physical force," the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6–7; *see also Sears*, 922 F.3d at 1205 (similar).

The United States Supreme Court has articulated factors for "determining whether the use of force" in the custodial context "was wanton and unnecessary." *Hudson*, 503 U.S. at 7; *see also Whitley*, 475 U.S. at 319 ("the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment"). Those factors (commonly referred to as the *Whitley* factors) include "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made

to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).

Also, "the extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321). "The extent of injury may also provide some indication of the amount of force applied." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). So, "[t]he absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Hudson*, 503 U.S. at 7.

In addition, the Supreme Court has instructed that "courts considering a prisoner's claim must ask both if 'the officials act[ed] with a sufficiently culpable state of mind' and if the *alleged wrongdoing* was objectively 'harmful enough' to establish a constitutional violation." *Hudson*, 503 U.S. at 8 (citation and quotation marks omitted; alteration in original; emphasis added). In this regard, the Supreme Court has referred to a "subjective" and "objective" component of a custodial excessive force claim. *Id.* ("the subjective aspect of an Eighth Amendment claim . . . can be distinguished from the objective facet of the same claim").

For the subjective component, analyzed under the *Whitley* factors, a court should be mindful of the prison officials' point of view based on the facts known at

the time, and should "give a wide range of deference to prison officials acting to preserve discipline and security." *Sears*, 922 F.3d at 1205 (citing *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007)). A court should recognize that "corrections officials must make their decisions in haste, under pressure, and frequently without the luxury of a second chance" (*Hudson*, 503 U.S. at 6 (citations omitted)), but that deference "does not insulate from review actions taken in bad faith or for no legitimate purpose" (*Whitley*, 475 U.S. at 322).

For the objective component, not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9 (citation omitted). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9–10 (citations and quotation marks omitted); *see Wilkins*, 559 U.S. at 38 ("An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." (citations and quotation marks omitted)).

But, regardless "whether or not significant injury is evident," "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9 (citing *Whitley*, 475 U.S. at 327). "Otherwise, the Eighth Amendment would permit any physical

punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Id.*

As the Supreme Court has explained, "[i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts." *Wilkins*, 559 U.S. at 38. "An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.*

Moreover, qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Saunders v. Duke*, 766 F.3d 1262, 1266 (11th Cir. 2014) (quoting *Lane v. Franks*, 573 U.S. 228, 243 (2014)). In order to receive the protection of qualified immunity, a government official first must show that he was acting in the scope of his discretionary authority when the allegedly wrongful acts occurred. *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004).

To overcome qualified immunity, a plaintiff then must show (1) that the official violated a constitutional right, and (2) that the right was clearly established

at the time of the alleged violation. *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). A court may address these two prongs "in either order." *Waldron v. Spicher*, 954 F.3d 1297, 1304 (11th Cir. 2020).

For a right to be clearly established, a plaintiff can either identify case precedents with materially similar facts or show that the violation was so obvious that every reasonable officer would know that his actions were unconstitutional. *Corbitt v. Vickers*, 929 F.3d 1304, 1311–12 (11th Cir. 2019). In other words, the law must give the officer "fair warning" that his conduct is unconstitutional. *Piazza v. Jefferson Cty., Ala.*, 923 F.3d 947, 955 (11th Cir. 2019) (citations omitted). In analyzing qualified immunity, courts focus not only on the state of the law, but on the factual information that the defendant possessed at the time of the alleged violation. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (stating that the qualified immunity analysis "will often require examination of the information possessed by" the defendant official).

In this case, Sanders alleges that Schult, Charley, Barr, Jacobs, and Hunte took him out to the shift office porch and punched him in the face, head, and body until Sanders fell to the ground, where he was "maced, stomped, and clubbed with batons by all six officers." Doc. 15 at 15. Sanders also alleges that, during this time, Sanders remained handcuffed with his hands behind his back, so he could not "shield himself." Doc. 15 at 15. Sanders alleges further that the assault was in retaliation

for an inmate assault on Stewart. Doc. 66 at 2; Doc. 67 at 2; Doc. 68 at 2; Doc. 69 at 2; Doc. 70 at 2. A body chart from October 15, 2023, shows that Sanders had lacerations around his eyes, and abrasions on his hands; the body chart indicates that Sanders said at the time that he was "handcuffed by the wrist and assaulted." Doc. 74-10 at 1.

Defendants deny that this alleged assault occurred, and deny using any inappropriate force against Sanders. Doc. 74-4; Doc. 74-5; Doc. 74-6 at 2; Doc. 74-7; Doc. 74-8.

At summary judgment, the court must construe all evidence and reasonable inferences in Sanders' favor. *See supra* Legal Standard; *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) ("[W]hen conflicts arise between the facts evidenced by the parties," the court must "credit the nonmoving party's version" (emphasis omitted)). As such, the record evidence presents genuine disputes of material fact. *See, e.g.*, *Williams*, 64 F.4th at 1197 ("a prisoner initiating a verbal altercation does not give prison guards carte blanche to use force sadistically and maliciously"). In short, the record evidence "pits the correctional officers' word against an inmate's," and those disputes must be resolved at trial. *Rivera v. LeBron*, 824 F. App'x 838, 842 (11th Cir. 2020). Resolving these fact disputes turns on credibility questions, which create fact issues for trial. *See Sconiers v. Lockhart*, 946 F.3d 1256,1263 (11th Cir. 2020) ("[W]hen competing narratives emerge on key events, courts are

not at liberty to pick which side they think is more credible.").

Defendants argue that "[t]here is no evidence, apart from Plaintiff's bare allegations, that the incident happened as the Plaintiff describes it." Doc. 74 at 17–18. But, under controlling Eleventh Circuit law, a *pro se* plaintiff is not required to produce independent objective evidence to create a genuine fact dispute for trial. *See, e.g.*, *Sears*, 922 F.3d at 1208–09. The Eleventh Circuit has clarified that, "[t]o the extent that [caselaw] suggests . . . that an inmate's first-hand account of excessive force needs corroboration to survive summary judgment, it is no longer good law in this circuit." *Williams*, 64 F.4th at 1198.

In addition, the fact that Sanders sustained only relatively minor injuries does not change the result at the summary judgment stage. Even a single blow to a prisoner nevertheless can violate the Constitution. *See, e.g.*, *Sconiers*, 946 F.3d at 1267 ("[C]ourts cannot find excessive force claims not actionable [just] because the prisoner did not suffer more than *de minimis* injury." (quotation marks omitted)); *Wright v. Grant*, 2021 WL 3934248, at *7 (N.D. Fla. July 7, 2021) ("An officer's single punch to a prisoner who does not pose a danger can constitute excessive force.").

As discussed above, while an "inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim," under the Eighth Amendment "[i]njury and force . . . are only imperfectly

correlated, and it is the latter that ultimately counts." *Wilkins*, 559 U.S. at 38 (citations and quotation marks omitted)). And, here, Sanders alleges that multiple officers beat him in retaliation for his perceived involvement in the assault on Stewart.

Further, construing all evidence and reasonable inferences in the light most favorable to Sanders, none of Defendants had any reason to use force against Sanders, because at the point in time that Sanders alleges they attacked him the incident in J Dorm had ended and Sanders was handcuffed. *See e.g.*, *Ledlow v. Givens*, 500 F. App'x 910, 914 (11th Cir. 2012) ("[t]he use of force against an inmate who no longer poses a threat is not permitted," and once an inmate is handcuffed he no longer poses a threat).

Moreover, on the current record, because a reasonable factfinder could find or infer that there was no "need for application of force" (*Hudson*, 503 U.S. at 7), and that Defendants applied the alleged force "maliciously and sadistically to cause harm" in retaliation for the assault on Stewart, and not "in a good-faith effort to maintain or restore discipline" (*Hudson*, 503 U.S. at 6–7), Defendants are not entitled to qualified immunity at this time. On the current record, Defendants had "fair warning" that such alleged conduct is unconstitutional. *See Piazza*, 923 F.3d at 955; *see also Pullen v. Osceola Cty.*, 861 F. App'x 284, 290 (11th Cir. 2021) (the use of force "maliciously and sadistically to cause harm" is a clearly established

violation of the Eighth Amendment, and "[t]here is simply no room for a qualified immunity defense when the plaintiff alleges such a violation" (quoting *Skrtich v. Thorton*, 280 F.3d 1295, 1302 (11th Cir. 2002))).[6]

**IV. The court should deny summary judgment on Sanders' Eighth Amendment failure to intervene claim against Pelzer.**

Prison officials can be held liable under § 1983 if they fail or refuse to intervene to protect a prisoner from another officer's use of excessive force. *Velasquez v. City of Hialeah*, 484 F.3d 1340, 1341–42 (11th Cir. 2007). Prison officials who witness an assault are generally obligated "to take reasonable steps to protect the victim." *Ledlow*, 500 F. App'x at 914 (citing *Skrtich*, 280 F.3d at 1301).

A plaintiff alleging a claim for failure to intervene must show that the defendant was "in a position to intervene" but "failed to do so." *Williams*, 64 F.4th at 1199. A claim for failure to intervene also requires a showing of a defendant's deliberate indifference to a substantial risk of serious harm. *See Murphy v. Turpin*, 159 F. App'x 945, 948 (11th Cir. 2005) (discussing the application of the deliberate

---

[6] In *Skrtich*, the Eleventh Circuit held that "a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment." *Skrtich*, 280 F.3d at 1301. But multiple district courts in this circuit—including in this district—have noted "significant tension between *Skrtich*'s bright-line rule and Supreme Court precedent on qualified immunity, which may call for a more fact-specific analysis of whether the particular type and extent of force at issue has been 'clearly established' as unconstitutional." *Wilhite v. Parker*, No. 7:20-CV-00847-KOB, 2022 WL 3718502, at *3 (N.D. Ala. Aug. 29, 2022); *see Stalley v. Cumbie*, 586 F. Supp. 3d 1211, 1227 n.8 (M.D. Fla. 2022).

indifference standard to a failure to intervene claim).

For the reasons discussed above regarding Sanders' excessive force claims (*see supra* Part II), the court should deny Pelzer's summary judgment motion on Sanders' failure to intervene claim. Construing the evidence and reasonable inferences in Sanders' favor, Pelzer failed to take reasonable steps to help Sanders—even though Pelzer was in a position to do so—as Sanders was assaulted by multiple other officers, after order had been restored in J Dorm, and in retaliation for the earlier inmate assault on Stewart. *See Ledlow*, 500 F. App'x at 914. Sanders avers that Jacobs, Shult, Barr, Charley, and Hunte assaulted him while Pelzer stood by and watched. Doc. 36 at 3. Pelzer nowhere avers that he was not in a position to stop the alleged assault, and instead avers that Sanders' injuries were "sustained during the incident where he decided to physically assault staff and those staff members responded with force." Doc. 74-2 at 2.

Pelzer's averments disputing Sanders' side of the story create only a factual "he said/he said" dispute for trial. Given Sanders' allegations that Pelzer stood by while multiple officers took part in assaulting Sanders, as well as Sanders' allegations regarding the nature of the alleged assault—including macing Sanders, stomping on him, and hitting him with batons, Doc. 15 at 15—a reasonable factfinder could find or infer that Pelzer was "in a position to intervene" but "failed to do so" and did not respond in a reasonable manner to the alleged assault, which

posed a substantial risk of serious harm to Sanders. *See Williams*, 64 F.4th at 1199. Accordingly, there are genuine disputes of material fact for trial on Sanders' claim for failure to intervene. *See Velazquez*, 484 F.3d at 1342 (the prisoner's and the prison guards' contradictory stories presented an issue of fact for trial); *see also Woodyard v. Alabama Dep't of Corr.*, 700 F. App'x 927, 933–34 (11th Cir. 2017) (discussing what a reasonable factfinder could believe based on the facts presented to the court at summary judgment).

Moreover, on the record evidence (including Sanders' sworn allegations and the reasonable inferences therefrom), Pelzer is not entitled to qualified immunity on Sanders' claim for failure to intervene. On the current record, Pelzer's alleged failure to intervene in an ongoing constitutional violation, despite the ability to take reasonable steps to do so, and despite the substantial risk of serious harm to Sanders, is a clearly established violation of the Eighth Amendment. *See Williams*, 64 F.4th at 1199; *see also Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1560 (11th Cir. 1993), *as amended*, 14 F.3d 583 (11th Cir. 1994) ("A police officer has a duty to intervene when another officer uses excessive force.").

## RECOMMENDATION

For the reasons stated above, this report **RECOMMENDS** that the court **DISMISS WITHOUT PREJUDICE** Sanders' claims against Defendant Stewart.

This report also **RECOMMENDS** that the court **GRANT** Defendants'

summary judgment motion on Sanders' Fourteenth Amendment claim against Defendant McPhail.

This report **RECOMMENDS** further that the court **DENY** Defendants' summary judgment motion (Doc. 74) on Sanders' Eighth Amendment excessive force claims against Defendants Jacobs, Schult, Charley, Hunte, and Barr, in their individual capacities, and Eighth Amendment failure to intervene claim against Defendant Pelzer, in his individual capacity, and **REFER** those claims back to the undersigned for further proceedings consistent with this report.

## NOTICE OF RIGHT TO OBJECT

Any party may file specific written objections to this report and recommendation. Any objections must be filed with the Clerk of Court within **14 days**. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b). The objecting party must identify every objectionable finding of fact or recommendation and state the specific basis for every objection. The objecting party also must identify every claim in the complaint that the report and recommendation has not addressed. Objections should not contain new allegations, present additional evidence, or repeat legal arguments.

A party who fails to object to factual or legal conclusions in the Magistrate Judge's report and recommendation waives the right to challenge on appeal those same conclusions adopted in the District Judge's order. Without a proper objection, however, the court on appeal may review the unobjected-to factual and legal

conclusions for plain error if necessary in the interests of justice. 11th Cir. R. 3-1.

After receiving the objections, a District Judge will conduct a de novo review of the relevant portions of the report and recommendation and may accept, reject, or modify, in whole or in part, the Magistrate Judge's findings of fact and recommendations. The District Judge also may refer this action back to the Magistrate Judge with instructions for further proceedings.

A party may not appeal the Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. A party may appeal only from a final judgment entered by a District Judge.

**DONE** this October 22, 2026.

**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE